UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Holding a Criminal Term

Grand Jury Sworn in on June 6, 2025

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL NO. |
| v. | (UNDER SEAL) |
| FAN YANG<br>also known as "Jocelyn Yang," and<br>JING TIAN,<br><br>Defendants. | VIOLATIONS:<br><br>COUNT 1: 18 U.S.C. § 1349 (Conspiracy to Commit Securities Fraud)<br><br>COUNT 2: 18 U.S.C. § 371 (Conspiracy to Commit Securities Fraud)<br><br>FORFEITURE:<br>18 U.S.C. § 981; 21 U.S.C. § 853(p); and 28 U.S.C. § 2461(c) |

## INDICTMENT

The Grand Jury charges that, at all times material to this Indictment, on or about the dates and times stated below:

### Introduction and Background

1. Company-1 was an American corporation, headquartered in Indiana, that designed, manufactured, and distributed engines, filtration, and power generation products.

2. Company-2 was an American corporation, headquartered in Michigan, that manufactured automobile components for military suppliers, trucks, and trailers.

3. **FAN YANG** ("YANG"), was an employee of Company-1 and held the title Corporate Development Manager/Strategy Finance Controller.

4. **JING TIAN** ("TIAN"), was married to **YANG**, and was an employee of Company-1 and held the title Global QSK78 Mechanical Integration Leader at Company-1.

5. Trader-1, resided in Chantilly, VA and attended Georgetown University for graduate school.

6. Trader-2 was married to Trader-1 and resided in Chantilly, VA.

7. Trader-3, resided in Bellevue, Washington and attended Georgetown University for graduate school.

8. Trader-4 was a college friend of Trader-2.

9. Trader-5 is an associate of **YANG**.

10. The Securities and Exchange Commission ("SEC") was a federal government agency authorized by law to investigate and bring legal action against those involved in violations of federal securities laws, including those suspected of insider trading, that is, engaging in fraudulent securities transactions on the basis of material non-public information ("MNPI").

11. In 2019 and 2020, Company-1 and Company-2 discussed an acquisition whereby Company-1 would buy Company-2 at a proposed valuation of $33 per share. However, after Covid-19 began to spread, Company-1 terminated those discussions in March 2020 to focus on responding to the market and operational turmoil associated with the pandemic.

12. Between February and October 2021, Company-1 personnel held internal discussions about acquiring Company-2.

13. In or around November 2021, Company-1 re-started non-public discussions with Company-2 to acquire Company-2.

14. On December 14, 2021, Company-1 sent Company-2 a non-public preliminary non-binding proposal to acquire all outstanding Company-2 shares for a price of $33.50 per share.

15. On January 14, 2022, Company-1 sent Company-2 an updated non-public non-binding proposal to acquire all outstanding Company-2 shares for a price of $35.00 per share.

16. On January 26, 2022, Company-1 sent Company-2 a non-public final offer to acquire all outstanding Company-2 shares for a price of $36.50 per share.

17. On January 27, 2022, Company-2 confidentially indicated its interest to Company-1 in moving forward with negotiating definitive documentation for an acquisition.

18. On February 22, 2022, Company-1 announced an agreement to acquire Company-2 at a price of $36.50 per share, for a total transaction value of $3.7 billion. Company-2 stock rose to $35.55 before markets opened, an increase of approximately 44% from the prior day's closing price.

### Possession and Transfer of Material Non-Public Information

19. In or around October 2021, **YANG** began to acquire MNPI as a result of her employment with Company-1. Initially, this MNPI related to Company-1's significant interest in acquiring Company-2. Subsequently, the MNPI related to confidential discussions between Company-1 and Company-2

20. Beginning by at least November 2021, **YANG** and **TIAN** began discussing and executing securities purchases in Company-2, coordinating wire transfers, Zelle transfers, and funding brokerage accounts in order to buy securities in Company-2.

21. In or around November 2021, Trader-4 acquired MNPI regarding Company-1's plan to acquire Company-2 originating from **YANG** and **TIAN**.

22. In or around November 2021, Trader-4 contacted Trader-1 and informed Trader-1 that Company-1 was planning to acquire Company-2 and that Trader-1 should purchase Company-2 securities.

23. In or around November 2021, Trader-4 contacted Trader-1 and told Trader-1 that Company-2 would publicly announce the acquisition during a December 7, 2021 "Strategy Day" presentation.

24. On or around November 11, 2021, Trader-4, who was in China at the time, began purchasing options contracts and stock in Company-2.

25. On or about November 15, 2021, Trader-1 began purchasing options contracts and stock in Company-2.

26. In or around November 2021, Trader-4 provided Trader-1 with the username and login information for Trader-4's online trading account and an account belonging to Trader-4's mother. Trader-4 asked Trader-1 to execute multiple trades on her behalf due to the time difference and market hours while Trader-4 was located in China.

27. From in or around November 2021 and continuing through February 22, 2022, Trader-1 executed multiple stock and options trades in Company-2 based on MNPI originating from **YANG** and **TIAN** on behalf of Trader-4 and her mother, from inside of the District of Columbia.

28. On November 22, 2021, **YANG** sent a WeChat message to **TIAN** discussing their securities purchases, stating, "We have over 100,000 in there. If the acquisition is completed with 3.5b, we can get a Tesla. Trade in and don't need a loan haha."

29. On November 28, 2021 **YANG** sent a message to Trader-5 stating, "You don't buy stocks right?" Trader-5 replied, "I do not." **YANG** responded, "I have one that I can recommend to you. If you have an account to operate. [Company-2]." Trader-5 responded, "I can buy after you. But when you sell it. You have to let me know. I have bad luck in stocks." **YANG** responded, "I won't say it's risk free, but it's very likely to go up $10 per share. I have a position. I will let

you know when I sell it." Trader-5 responded, "It's because you have good luck. Hahahaha." **YANG** finally replied, "This is definitely not luck. But I can't tell you more. I can tell you later."

30. On November 29, 2022, **YANG** followed up with Trader-5 and stated, "That stock, waste no time to buy it. Ha." Trader-5 replied, "Bought it. Sell it before 36, right?" **YANG** replied, "I will let know when the time comes."

31. On December 1, 2021, Trader-1 contacted Trader-3 and inquired whether Trader-3 was active in the stock market. Trader-1 informed Trader-3 that he had a short-term recommendation that needed to be acted upon within the week. Trader-1 proceeded to send Trader-3 Company-2's ticker symbol. Trader-1 also advised Trader-3 to purchase Company-2 shares before December 7, 2021.

32. On December 3, 2022, Trader-5 asked **YANG**, "Which team are you in right now?" **YANG** replied, "I am at corporate development…Under strategy, manage merger and acquisition, and establish joint venture."

33. On December 10, 2021, **YANG** and **TIAN** discussed the position of another trader with whom they shared MNPI. **TIAN** stated, "Just now. [REDACTED] called me. [He] has some emotional fluctuations." **YANG** replied, "How much did he buy?...60,000?" **TIAN** responded, "Yes" and followed up with "You are a senior manager. You have seen big scenes." **TIAN** further stated, "I told him we are still holding it. We have some external accountants and legals here recently. Things are making progress."

34. On December 13, 2022, **YANG** sent a message to Trader-5 stating, "The stock I recommended to you, don't panic. Ha. I will let you know when I sell it…It's not long term. The most it will take is 1-2 months." **YANG** later asked, "Why didn't you ask me why I recommend it to you? Haha." Trader-5 replied, "Must be insider news. Hahaha." Trader-5 followed up by asking

"Anyway, why did you recommend? Just asking." **YANG** replied, "We [Company-1] are acquiring it. You have to keep it confidential." Trader-5 responded "Oh shit. Okay. I will buy more." **YANG** responded, "Just try your best. I am not in the project team so I only know limited information." **YANG** finally stated, "My assumption is it will be around the end of January or early February."

35. On December 16, 2021, **YANG** told **TIAN**, "Plan to announce in the early February. I am about to sign NDA. . . Don't touch stocks for now." **TIAN** responded with an " 🫣 " emoji. **YANG** replied, "The legal team is asking me was I involved in the [Company-2] before I signed the nda. I said the meeting this morning is my first [Company-2] meeting. I was not involved in anything previously."

36. On the same day, December 16, 2021, Trader-4 sent Trader-1 a message asking Trader-1 to call Trader-4 to inform Trader-1 of "the latest news." Trader-4 further told Trader-1 that certain individuals "got pulled in to sign the NDA," referring to a non-disclosure agreement.

37. Also on December 16, 2021, Trader-1 sent Trader-3 a message informing Trader-3 of the specific price Company-1 offered Company-2 along with news that individuals involved in the negotiations were brought in to sign non-disclosure agreements. Trader-1 also informed Trader-3 that he expected Company-1's offer price to increase.

38. Throughout December 2021 and into January 2022, Trader-4 continued discussing Company-2 securities prices and trading strategies with Trader-1.

39. On December 20, 2021 **TIAN** sent **YANG** a message stating, "Stock is plunging so bad that my pants fell off." **YANG** replied, "Just don't make any move."

40.     In January 2022, Trader-4 told Trader-1 that Company-1 management held a meeting over the weekend, that they started their holiday break in mid-December, and were just returning to work.

41.     In January 2022, Trader-4 and Trader-1 discussed trading strategies that may cause the SEC to flag their trades.

42.     On or about January 13, 2022, Trader-1 sent Trader-3 a message recommending that Trader-3 purchase more Company-2 shares because the public announcement was expected in February.

43.     On January 24, 2022 **YANG** sent **TIAN** a message stating, "[Company-2] went up last week because we submitted another revised offer. Last Friday. But there's still gap from both sides. Will submit another one this week. This will be the last round. Do or die this time. I am sure it will go higher than 32. . . [Company-1 Executive] thinks it's very possible it will work out." **TIAN** replied, "I will tell [REDACTED] in the evening. The big bro is about to step on to the rooftop."

44.     On January 25, 2022, to give Trader-1 more confidence, Trader-4 shared with Trader-1, a screenshot of a conversation between Company-1 employees **YANG** and **TIAN** discussing Company-1's non-public negotiations to acquire Company-2 along with the predicted final offer price:



YANG: It must be because of this

YANG: But there is still a gap between both sides

YANG: They'll negotiate one more round today

YANG: It will be the final round

YANG: Whether it succeeds or not, this is the last time.

YANG: I think it will definitely end up higher than 32.

TIAN: hmmmmm

TIAN: If it doesn't work out, it's just….

YANG: Yeah

YANG: But both side's expectations are already very close.

YANG: [Company-1 Executive] thinks the chances of success are still very high

45. On January 28, 2022, **TIAN** asked **YANG**, "No news on [Company-2]?"

46. On February 18, 2022, Trader-4 informed Trader-1 that Company-1 was going to "send it over again today" and that "next week the other side decides whether to accept it or not." Trader-4 further explained that "they said SEC will pull out the shareholder list and go through it, they're being very cautious."

47. On February 21, 2022 **YANG** sent **TIAN** a message stating, "Announce tomorrow morning. 730am." **TIAN** responded, "Incredible."

48. On or about February 21, 2022, Trader-4 sent a message to Trader-1's wife with a screenshot of a conversation involving an employee of Company-1 with the Chinese character for "Tomorrow will be better."

8

49. On February 21, 2022, Trader-4 sent Trader-1 a message stating, "let's hope for good news tomorrow."

50. On February 22, 2022 **YANG** sent a message to **TIAN** stating, "News is out. 36.5."

### YANG's Breach of Her Duties to Company-1 and its Shareholder

51. As an employee of Company-1, **YANG** had a fiduciary duty and a duty of trust and confidence to Company-1 and its shareholders not to use Company-1's MNPI for her personal benefit or to disclose Company-1's MNPI without authorization.

52. **YANG** breached these duties by using Company-1's MNPI regarding Company-1's significant interest in acquiring Company-2 and Company-1's discussions with Company-2 when placing orders to buy Company-2 securities.

53. **YANG** further breached these duties by tipping **TIAN** and Trader-5 the MNPI she learned from her role at the company about Company-1's significant interest in acquiring Company-2 and Company-1's discussions with Company-2 about an acquisition.

54. **TIAN** knew or should have known that **YANG** was breaching her fiduciary duty and duties of trust and confidence to Company-1 and its shareholders when she tipped him the MNPI about Company-1 and Company-2.

### Use of Material Non-Public Information in Trading

55. On or about October 27, 2021 **YANG** executed her first Company-2 securities purchases and continued acquiring Company-2 securities (6,700 shares) through December 14, 2021 based on MNPI relating to Company-1's discussions about acquiring Company-2.

56. On or about November 30, 2021, **TIAN** began purchasing Company-2 securities based on MNPI relating to Company-1's discussions about acquiring Company-2.

57. From in or around November 2021 and continuing through February 22, 2022, Trader-1 purchased and held securities in Company-2, in his name and Trader-2's name, based on MNPI. Through these trades, Trader-1 made a profit of at least $178,000.

58. From in or around December 2021 and continuing through in or around February 22, 2022, Trader-3 purchased and held securities in Company-2 based on MNPI relating to Company-1's plan to acquire Company-2. Through these trades, Trader-3 made a profit of at least $144,000.

59. From November 2021 and continuing through February 22, 2022, Trader-4 purchased and held options and securities in Company-2 based on MNPI relating to Company-1's plans to acquire Company-2. Through these trades, Trader-4 made a profit of at least $86,989.

60. From November 2021 and continuing through February 22, 2022, Trader-4's mother purchased and held options and securities in Company-2 based on MNPI relating to Company-1's plans to acquire Company-2. Through these trades, Trader-4's mother made a profit of at least $56,000.

## COUNT ONE
## 18 U.S.C. § 1349
## Conspiracy to Commit Securities Fraud

61. Paragraphs 1 through 60 are re-alleged herein.

62. Beginning on a date unknown, but no later than October 2021, and continuing through at least February 2022, within the District of Columbia and elsewhere, the defendants,

**FAN YAN**
**also known as "Jocelyn Yang," and**
**JING TIAN,**

conspired with one another, and with others known and unknown to the Grand Jury, to commit securities fraud, that is, to knowingly execute and attempt to execute a scheme and artifice (a) to

defraud persons in connection with securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Company-2; and (b) to obtain, by means of false and fraudulent pretenses, representations and promises, money and property in connection with the purchase and sale of securities of issuers with a class of securities that was registered under Section 12 of the Securities Exchange Act of 1934, including Company-2 in that **FAN YANG**, traded in the securities of Company-2 while in possession of MNPI in breach of her fiduciary duty and duty of trust and confidence to Company-1 and its shareholders and, also in breach of these duties, provided MNPI to other co-conspirators so that they could trade in the securities of Company-2 for personal benefits and as gifts, in violation of Title 18, United States Code, Section 1348, and in that **JING TIAN**, Trader-1, Trader-2, Trader-3, Trader-4, Trader-5 and others traded in the securities of Company-2 while in possession of MNPI disclosed by **FAN YANG** that they knew or should have known breached her fiduciary duty and duty of trust and confidence to Company-1 and its shareholders, and provided MNPI to other co-conspirators so that they could trade in the securities of Company-2, in violation of Title 18, United States Code, Section 1348.

(In violation of Title 18, United States Code, Section 1349)

### COUNT TWO
### 18 U.S.C. § 371
### Conspiracy to Commit Securities Fraud

63.   Paragraphs 1 through 60 are re-alleged herein.

64.   Beginning on a date unknown, but no later than October 2021, and continuing through at least February 2022, within the District of Columbia and elsewhere, the defendants,

**FAN YANG**
**also known as "Jocelyn Yang," and**
**JING TIAN,**

conspired with one another, and with others known and unknown to the Grand Jury, to commit an offense against the United States, to wit, securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5, that is, knowingly and willfully, by the use of means and instrumentalities of interstate commerce, the mails, and the facilities of a national securities exchange, directly and indirectly to use and employ manipulative and deceptive devices and contrivances in connection with the purchase or sale of securities in contravention of Rule 10b-5 of the Rules and Regulations promulgated by the United States Securities and Exchange Commission, and to (a) employ a device, scheme, and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of circumstances under which they were made, not misleading; and (c) engage in acts, practice, and courses of business which would and did operate as a fraud and deceit in connection with the purchase and sale of securities of Company-2 in that **FAN YANG**, traded in the securities of Company-2 while in possession of MNPI in breach of her fiduciary duty and duty of trust and confidence to Company-1 and its shareholders and, also in breach of these duties, provided MNPI to other co-conspirators so that they could trade in the securities of Company-2 for personal benefits and as gifts, and in that **JING TIAN**, Trader-1, Trader-2, Trader-3, Trader-4, Trader-5 and others traded in the securities of Company-2 while in possession of MNPI disclosed by **FAN YANG** that they knew or should have known breached her fiduciary duty and duty of trust and confidence to Company-1 and its shareholders, and provided MNPI to other co-conspirators so that they could trade in the securities of Company-2.

(In violation of Title 18, United States Code, Section 371)

## FORFEITURE ALLEGATION

65. Upon conviction of the offense alleged in Counts One and Two of this Indictment, the defendant shall forfeit to the United States any property, real or personal, which constitutes or is derived from proceeds traceable to this offense, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

66. If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the value of the property described above, pursuant to Title 21, United States Code, Section 853(p).

**(Criminal Forfeiture**, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))

A TRUE BILL

FOREPERSON

JEANINE FERRIS PIRRO
ATTORNEY FOR THE UNITED STATES
IN AND FOR THE DISTRICT OF COLUMBIA

13